No, no, pardon us. Penultimate case, which is Gogos v. AMS-Mechanical System. Ms. Brown. May it please the Court. My name is Collette Brown on behalf of the plaintiff appellant, Mr. Antimos Gogos. This case presents the kind of situation the Americans with Disabilities Act was meant to prevent. Mr. Gogos has hypertension. On the date in question, he was at work when he had an episode of hypertension, where it caused, among other things, him to lose his vision. He immediately notified his immediate supervisor, Ms. Christine Kramer, by writing a note that stated, as you know, my blood pressure is high, my right eye is red, I lose vision on and off, I need, I would like to take my day off to go to see the doctor. Why didn't he want to give a doctor's report to his supervisor? Excuse me, Your Honor? Didn't he refuse to give a doctor's report to his supervisor? No, he did not, Your Honor. He was given permission to go and seek medical attention by Ms. Kramer. On his way to seek his medical attention, another supervisor, Mr. Don Henson, confronted him and asked for a doctor's note. In response, Mr. Gogos testified that he said, I don't know if I can make it safely to the hospital to get you the note. So he did not refuse to get a note. He was explaining to Mr. Henson that he needed to go to the hospital because of his high blood pressure and his loss of vision. Mr. Henson is badgering him for a doctor's note, and his response is, I don't know if I can make it safely to the hospital to get you the note. So he never refused to produce a note. He was explaining to Mr. Henson that he's trying to get treatment, and he doesn't know if he can make it safely. That was the only time that he was requested to provide a note? That was the only time that he was requested to provide a note as he was trying to seek medical treatment for his hypertension. He had already been given permission by Ms. Kramer to go and seek medical attention, and then Mr. Henson came and demanded a note. But he'd never been asked to produce any sort of note prior to that interaction. Well, he'd only been on the job for about a month, as I understand it, and these absences had occurred before without a doctor's note, and the story that you've just related is partial. It doesn't tell the whole story what happened after he initially refused to promise to bring a note. He escalated the encounter with Henson, and it became an episode of insubordination. We highly dispute that it was insubordination. There were previous absences. However, we have undisputed testimony that for the three previous times he was absent, he received permission prior to the absences from Mr. O'Hara. He called ahead of time and consistent with AMS, the employer's requirements, that he seek permission first. Right, but there can be no argument that Henson's request for a doctor's note was appropriate, and what happened is that your client escalated the situation by getting into a power struggle with Henson and swearing at him and telling him he wasn't going to bring a note, et cetera, without repeating exactly what was said. Respectfully, Your Honor, that is from Mr. Henson's point of view. Mr. Gogos disputes that testimony. He testified that he explained to Mr. Henson he was seeking medical attention because he was losing his vision and that Mr. Henson approached Mr. Gogos and was in his face and shouting and screaming demands. So it's highly disputed what exactly escalated this encounter, but it's undisputed that Mr. Henson's the person that confronted Mr. Gogos, made these demands. But as far as who did what or what the screaming match was about, that's highly disputed, and the district court erred in not viewing the facts in the light most favorable to Mr. Gogos because the version of the story that Mr. Henson gave is directly contradicted by the version that Mr. Gogos gave. So there's a material issue of disputed facts regarding that encounter and whether it was, in fact, in subordination, especially in light of Mr. Gogos's anxiety because he was losing vision. He was trying to get to the hospital. He's in an anxious state. There's also an element of his language communication. English is his third language. And so all of that plays into the totality of what happened in this one interaction. Well, in the undisputed statement of facts, he doesn't deny yelling and swearing and refusing to supply a note. He had the opportunity to deny it, and he did not deny it. Your Honor. There may be a factual dispute about who started it, but once the situation escalated, he's not denying that he yelled and swore and refused to supply a note. Your Honor, we do tonight in the record document number 93, where we dispute the defendant's version of the story. This is on page 16. In our separate appendix, it's on page 137. We state that Gogos objects to the characterization of the testimony. Gogos testified that Henson raised his voice to accuse Gogos of taking too much time off, and Gogos informed Henson that he needed to go to the hospital. Gogos also testified that Henson was yelling and screaming at him and that Henson was one inch away from Gogos' nose and that Henson was coming towards Gogos' nose and he was there, and this is quoting him, very short and very close to my nose. Additionally, Gogos denied aggressively touching Henson and testified that they were both moving. So we do dispute the version of the encounter that Mr. Henson gave. Well, he didn't dispute that he himself raised his voice, yelled, swore, and refused to supply a note. He had the opportunity to deny that and did not, so we can assume that those things occurred. And what Mr. Gogos said was once Mr. Henson was raising his voice, that's when Gogos raised his voice. Right, that's what I suggested, that there is a factual dispute about who started it, but once it got started, he participated vigorously in refusing to supply a note, swearing, yelling, and otherwise contributed to the escalation of the situation. We dispute that he refused to produce a note. Well, he didn't dispute that in his response to the statement of facts. He could have, but he did not, so we take that as an admission. I believe in our statement of facts we said that he said he didn't know if he could safely go there. He wasn't saying he wouldn't produce the note. What he was explaining is that he doesn't even know if he can make it. Right, but if he didn't refuse, then you would expect him to deny the positive statement that he refused to supply a note, and he didn't deny it. He just changed the subject in the response. And, Your Honor, are you looking at the statement of facts? I just want to make sure that we're looking at the same information. With your client's response to the defendant's statement of facts, he had the opportunity to deny that he refused to supply the note, that he was yelling, that he was swearing, et cetera, and he never denied any of those things. He just said, Henson started it. Right, so we didn't deny the characterization. Right. We don't deny that there was a confrontation. Right, so we accept that he yelled, swore, refused to supply the note. We dispute that he initiated it and that he simply was, I guess you could say, matching Henson's voice in order to get his point across. But we dispute that he was terminated because of insubordination. In fact, this issue of insubordination did not, the defendant did not use this as a reason for termination until after this lawsuit was filed. When he was terminated on the termination sheet, it says excessive absences and that Mr. Gogos continued to be absent after he was warned. But there's nothing in the record that supports that he was ever warned about being absent or given any oral or written warnings. Well, there were a couple of different reasons given, including one that was given at your client's request, right? He wanted this characterized as a layoff so he could get unemployment compensation. And, Your Honor, this also goes back to what the employer's duty was. So there was this encounter, and we believe that this was the opportunity for the employer to engage in an interactive process. Mr. Henson could have asked Mr. Gogos prior to this encounter escalating why he was going to the hospital. Again, Mr. Gogos was in an anxious state. He has hypertension. He's losing his vision. He's already been given permission to go and seek medical attention, and he's been prevented by Mr. Henson. Mr. Henson testified that he never asked why he was going. None of the agents of AMS ever followed up to ask why he needs to go to the hospital or to see if he did, in fact, have a disability that may have needed an accommodation. Well, that's what the doctor's note would have begun, is that interactive process. But without the doctor's note, you can't have an interactive process. And he was terminated before he even had the chance to bring in a doctor's note. Right, but this gets back to my earlier line of questioning. If he refused to supply the doctor's note as part of this confrontation, we don't even get to the question about interactive process. And I understand, but in the light most favorable to Mr. Gogos, a reasonable jury could find that in this anxious state, in this heightened state, that he was trying to explain to Mr. Henson, first I need to go to the doctor because I'm losing my vision. I have had high blood pressure. I'm in fear for my life. This was not a time for Mr. Henson to initiate this encounter in this grieving match with someone who's in an anxious state. There's a language barrier here. And Mr. Gogos disputes that he refused to proper a note. He just said he couldn't get it right now until he could get there safely. And I see that I'm in my rebuttal time. Okay, thank you, Ms. Brown. Mr. Doherty? Good morning. May it please the Court, my name is Brian Doherty. I represent AMS Mechanical Systems, Inc. The issue in this case is pretty straightforward, and that is whether if everything else had been the same but that Mr. Gogos did not suffer from his alleged disability, would he have been terminated? And based on Mr. Gogos' own testimony in his deposition, that is the case. In his deposition, he said, quote, Page 288. Later on, to Mr. Henson, quote, That was referencing the BP security badge that the employees needed to enter and exit the premises. Again, you cannot fire me. Page 290. Even besides those statements by Mr. Gogos, he then told Mr. Henson, quote, Well, this is problematic for two reasons. At his deposition, Mr. Gogos clearly stated that he was not recording Mr. Henson with his cell phone, so he lied to his supervisor on top of the insubordinate comments that he made. Secondly, under AMS and BP policies, written policies that were given to Mr. Gogos, it was prohibited to bring cell phones into the work site because it was a safety issue. Was this all one incident that... It is all one incident, Your Honor, that occurred. It was maybe about a ten-minute confrontation between Mr. Gogos and Mr. Henson. Then, as Mr. Henson was attempting to extract himself from the confrontation, as he turned his back and walked away, Mr. Gogos grabbed him by the shoulder and attempted to spin him back around to talk to Mr. Henson. That fact, in and of itself, was not disputed at the summary judgment stage. That fact alone is enough for termination. Now, when you look at Mr. Henson's response to that, he indicated, at this point in time, you are terminated. Now, when you measure that against AMS's employment policies, it clearly states forms of misconduct, one of which is insubordination. We have admissions in the record from Mr. Gogos that he was insubordinate. It comes right from his deposition. Another instance of misconduct that would warrant discipline, including termination, is manhandling another employee. In this case, you have an admission by Mr. Gogos that he grabbed the general foreman at the work site and attempted to spin him around. Where is that admission? That is contained, I believe it is, paragraph 54 of Mr. Gogos' response to the statement of facts when he put his hands on Mr. Henson. And that fact was denied, but there was no citation in the record, nothing in the deposition, nothing by way of counter-affidavits to deny that fact. And based on Local Rule 56.1, that fact would stand as admitted. Now, even aside from misconduct, there is no way that Mr. Gogos could have been terminated on the basis of a disability because Mr. Henson had no knowledge that Mr. Gogos was suffering from any disability whatsoever. While Mr. Henson was mistaken as to Mr. Gogos' prior absences, it is established law that just because an employee misses work on prior occasion does not mean that that employee is suffering from a disability. Employees miss work all the time for ailments, for other personal reasons. It's not a reasonable inference that Mr. Gogos was seeking medical attention. Henson was the general foreman, and that's the person who would have to give him permission to leave. Not necessarily. The foreman was Christine Kramer, who gave Mr. Gogos permission to leave. As Mr. Gogos was leaving the site, he ran into Don Henson because prior to that, Mr. Henson and Ms. Kramer spoke, and she said, Mr. Gogos is leaving work again early. Mr. Gogos, or Mr. Henson at this point, was aware of prior absences and wanted to get to the bottom of this because it was unprecedented, according to Mr. Henson, that employees would be leaving work periodically, and he did not know why. Now, why is that important in the context of this case? AMS is a mechanical contractor employing welders and pipe fitters at the BP refinery, and it's common knowledge that fire and oil do not mix. Safety was of paramount importance at the job site. It was so important that on a daily basis, the welders and pipe fitters met in an enclosed structure before the workday started where they discussed safety with the foreman. The general foreman and foreman also discussed safety at the work site. Welders are paired with one another at the work site. As one welder is doing the work, the other welder is watching the safety of the work site. So if Mr. Henson had some type of medical condition that would impair his ability to do his job or observe the safety of another welder at the work site, Mr. Henson needed to know why. Not only that, but Mr. Henson was also concerned with productivity at the job site, which is why he wanted to get to the bottom of Mr. Gogos' absences. But Henson complained then to Dubeski? Is that the guy's name? Tom Dubeski. Correct. And even after Mr. Gogos was terminated by Mr. Henson, Mr. Gogos then went to the BP clinic because Mr. Henson saw that he needed medical attention, and Mr. Gogos' conduct escalated again with the BP personnel, so much so that a BP security official said, we're banning him from the property, have him collect his belongings, he can no longer be on the site. So the testimony is all corroborated between what BP saw and also what Mr. Henson observed. Now, the personnel change forms that were mentioned, Mr. Henson explained why he downplayed Mr. Gogos' conduct. These are union brothers. They stick together. The brotherhood comes first, then the employer second. He didn't want to ruin Mr. Gogos' chances of future employment, and he knew if he put down insubordination, that could possibly come back to haunt Mr. Gogos' chances of future employment. So he put down other, meaning voluntary resignation, and according to Mr. Henson, when Mr. Gogos refused to provide a doctor's note, he considered that to be disobeying an order and to have voluntarily resigned. He then put unexcused absences and tardiness, because, according to Mr. Henson, there were some absences and tardiness, which he did not fully understand the reasons why. So that is easily explainable. The testimony was not impeached anywhere. And on the second form that was supplied to Mr. Gogos, it had reduction in force. He solicited that form. He told AMS employee Tony Martinez, I want a different personnel change form because I want to collect unemployment. Mr. Martinez said okay. He talked with Terrence Gray. Terrence Gray mailed the form to Mr. Gogos, indicating reduction in force, which is standard fare. In conclusion, there is no evidence in this case that Mr. Gogos was terminated on the basis of a disability. And we respectfully request that this court affirm the district court's judgment, affirming summary judgment. Okay. Thank you, Mr. Gordy. Ms. Brown, your time has elapsed, but if you have something further, we'll listen. Yes, Your Honor. Just really quickly, we'd just like to end with the final point that the issue before that the district court granted summary judgment was that Mr. Henson did not have any knowledge at all that Mr. Gogos had a disability or needed an accommodation. In construing the facts in the light most favorable to Mr. Gogos, the non-movement, a reasonable jury could find that Mr. Gogos did inform, in fact, Mr. Henson and other agents at AMS of his disability. And it's heavily disputed this confrontation between Mr. Gogos and Mr. Henson, and therefore summary judgment should not have been granted. And we respectfully ask that the granted summary judgment is reversed and this matter is remanded. Thank you. Okay. Thank you, Ms. Brown and Mr. Gordy.